## SUPREME COURT — APPELLATE DIVISION. — THIRD DEPARTMENT.

### November, 1918.

## THE PEOPLE v. FRED CROSSMAN.

(184 App. Div. 724.)

HOMICIDE—EVIDENCE—CONFESSIONS INDUCED BY THREATS AND PROMISES—CODE CRIMINAL PROCEDURE, § 395.

A person charged with the crime of murder was delivered by the sheriff, on the order of the coroner, to a private detective in the employ of the district attorney, and taken several miles by train and automobile, in the night time, to the office of the district attorney. After being kept there from Monday morning until Tuesday evening, he made a confession, upon which he was convicted of murder in the second degree. Evidence examined, and *held*, to show that the confession was procured through threats of bodily harm and actual bodily harm and ill-usage, and by the promise of the district attorney, made through his agent, the detective, that if the defendant would admit the murder it would be treated as an accident and not a crime, and that the confession was inadmissible under section 395 of the Code of Criminal Procedure.

COCHRANE, and H. T. KELLOGG, JJ., dissented with opinion.

APPEAL by the defendant, Fred Crossman, from a judgment of the Supreme Court, Essex county, rendered against him on the 2d day of October, 1913, convicting him of the crime of murder in the second degree.

*Patrick J. Finn* (*H. E. Owen* of counsel), for the appellant.

*O. Byron Brewster,* for the respondent.

JOHN M. KELLOGG, P. J.:

The dead body of William King was found about midnight March 19, 1913, near the railroad track, in a position from

which it would naturally be inferred that he had been killed by the train which passed shortly before the body was found. There were injuries upon the head and other parts of the body. The defendant and Stafford were arrested, an inquiry was had before the coroner, and they were committed to the jail by the coroner on Thursday, March twentieth, about two o'clock. Sunday night the sheriff told the prisoners that he had been served with an order to turn them over to the detective. They objected to going but the sheriff told them they must, and about eleven o'clock at night they were removed by the detective from the county jail at Elizabethtown to Westport, a distance of eight miles, where they remained handcuffed to each other, seated in chairs, until about four o'clock next morning when they were put upon a train and taken to Port Kent and from Port Kent to Keeseville by automobile, arriving at Keeseville at seven o'clock in the morning. At Keeseville they were placed, each in separate rooms, across the hall from the office of the district attorney, and remained handcuffed to the arm of a chair from that time until eight o'clock on Tuesday evening, except when they went to the toilet or to their meals. The defendant had been drinking hard on the nineteenth, and during that night and until the confession was made he had been in a very bad physical and mental condition. He had not slept from Sunday, the twenty-third, to Tuesday night, the twenty-fifth. At about eight o'clock Tuesday evening the district attorney and the justice of the peace were brought into his room. The confession, which had been reduced to writing, was read to the defendant, and the district attorney told him that if he made the confession it could be used against him. The defendant, however, signed and swore to it, asking the justice what he supposed would be done to him. These facts are practically without contradiction.

While the order from the coroner required the sheriff to deliver the prisoners over to an unknown private detective, the

fact remains that such an order was not made for the purpose of any judicial inquiry or investigation, but was made solely for the purpose of taking the defendant from the jail illegally and to enable the detective to force from him a confession. The invalidity of the order appears on its face. We must conclude that the district attorney and the coroner were parties to the illegal act. Certainly the detective was acting for the district attorney, and was engaged by him for the purpose of extorting a confession from the defendant and Stafford. The defendant swears that the detective visited him frequently, using threats and coarse and brutal language to him, demanding in various forms that he admit that he killed the man. Defendant always protested his innocence. The defendant swears with reference to the last interviews: " The next morning he came in again the same way after breakfast. He says: ' Will you admit now you killed that man ? ' ' No, sir, I did not kill that man.' He says, ' you are a damned liar, you did kill him.' I says, ' I did not kill that man.' He kept the same thing up again and again and then went away and left me. He went away and left me there just the same as I was before, handcuffed to the chair, no sleep, no rest, could not speak to anybody, would not even give me any tobacco to chew or smoke as I was used to, that I was in misery all the time. I was in the chair and could not move out of this chair. Something like a swing chair, just about the same. It had an arm and my right hand was fastened to it all the while. So Tuesday night, Tuesday afternoon, he came in again and had the same thing over and over again. I told him I did not do it and I told the truth, I am as innocent as a child, but he kept it up. I told him I did not do it, so he got sick of asking me and went away. That night, along during the evening, he came in again and said, ' God damn you, you know you killed that man, admit you killed him.' I says, ' I did not kill him, I never killed that man, never had anything to do with it.' ' You know you did,' he says, ' don't call me a liar, if you do

I will knock your God damn brains out here,' and he walked up and stuck his fist in my face. ' I could knock you into small pieces small enough to pack in a market basket.' I says ' I did not kill him ' and then he turned and says, ' if you will admit that you killed that man, we will call it an accident and let you off.' I says, ' I will do or say anything to get out of here.' I could not stand it any longer. I had been there three nights and two days and had no sleep. I says, ' I will do anything, I will say anything to get away from here, take me into La Duke's office.' After that he took me into La Duke's office and got to work. He says, ' you say so,' and I says ' yes.' I answered his questions as he went along as he made it out his own way, I answered. When he got it made out it was type-written and I signed. Just before I went to sign the paper my hand shook so I could not sign them and he says to some-body, I do not remember who was there, ' if you won't say nothing, I will have him get you a little whiskey.' So he got a half pint of whiskey and gave me a drink of that whiskey. I took a couple of drinks and then I signed the paper. I drank the half pint and then they took me into another room where Shepard was and they had a lunch and a bottle of beer." After the confession the defendant was returned to the jail at Eliza-bethtown.

The detective denies that he used threats or made the promise; but considering the high-handed and illegal acts upon his part, he and those acting with him are discredited, and it is not unfair, where they and the defendant disagree, to treat the defendant as telling the truth. The evidence shows clearly that the defendant was a man of good character. He was a hard drinker and frequently intoxicated. Up to that time that ap-parently was the only blemish upon his character.

It is urged that the defendant's inquiring of the justice of the peace what would be done with him negatives the idea that he had been promised immunity. Whatever effect it has we

feel is in the opposite direction. It is quite natural, if the confession had been obtained under a promise of immunty, that when defendant was confronted with the district attorney and told that it could be used against him, he would be in doubt as to what his situation was. It is generally understood, I think, by men of the defendant's intelligence, that the punishment of murder is death, but after confessing to the crime of murder, we find him in doubt as to what would be done with him. Apparently the confession was taken down by a stenographer and committed to typewriting. The defendant says that the answers were substantially dictated by the detective. It is significant that the stenographer's evidence is not found in the record as to the manner and the circumstances under which the confession was made. It was too late for the defendant, when confronted by the district attorney and the magistrate, to rescind his confession, which was already in writing and had been made in the presence of the detective and the stenographer.

Aside from the confession, there is no substantial evidence connecting the defendant with the crime, and a conviction could not be had. The conviction, therefore, rests entirely for its substantial support upon the confession. It is desirable that real criminals should be convicted; it is undesirable that the officers of the law should become criminals in trying to punish crime. It is better for the public welfare that a criminal escape punishment than that punishment should follow such illegal and high-handed action on the part of the district attorney and his agent, the detective.

It may be that the defendant committed the crime. If he did, it is more probable that it was committed in the boathouse at the fight rather than that the defendant followed the decedent 900 feet and then killed him. But if the confession had been that the crime was committed at the boathouse, a claim of self-defense would naturally arise, and the detective may have thought it was better to show that the crime was committed at

the railroad as a cold-blooded murder. If in a drunken fight King was killed, it might not be unreasonable that the parties causing the death, to conceal their crime, might remove him to the railroad track and place him where it would seem that the approaching train had killed him. The defendant was sentenced October 2, 1913, for a minimum term of twenty years at Dannemora. The cause of justice will receive less detriment if the defendant escape further punishment on account of this drunken row than it will if conviction obtained in this illegal manner is allowed to stand.

Section 395 of the Code of Criminal Procedure permits the confession of a defendant to be used as evidence against him unless made under the influence of fear produced by threats, or unless made upon a stipulation of the district attorney that he shall not be prosecuted therefor. But it is not sufficient to warrant a conviction without proof that the crime charged has been committed. We think it is evident that this confession was procured by threats of bodily harm and by actual bodily harm and ill-usage of the defendant, and by the promise of the district attorney, made through the detective, his agent, that if defendant would admit the murder it would be treated as an accident and not a crime. Aside from the confession it is difficult to say that the evidence shows that the crime of murder was committed. Upon the evidence we are satisfied that the guilt of the defendant has not been proved beyond a reasonable doubt and that justice requires a new trial. The conviction should, therefore, be reversed upon the law and the facts, and the defendant returned to the custody of the sheriff of Essex county, there to await trial or such further proceedings in his matter as may be proper.

All concurred, except COCHRANE, J., dissenting with an opinion in which H. T. KELLOGG, J., concurred.

COCHRANE, J. (dissenting) :

The methods employed leading up to the confesion cannot be justified or approved. But that question is not an issue on this appeal. The real question is, was the confession a truthful one ? The trial justice could not exclude it from evidence. All the facts and circumstances leading up to it as claimed both by the defendant and the prosecution were given to the jury. In a charge against which no criticism is made the jury were instructed to consider these facts and if they concluded that the confession was not voluntary or not in accordance with the facts they should disregard it. The charge as elaborated was more favorable to the defendant than he could legally require. The jury had the great advantage not possessed by us of being able to consider the personality of the defendant as a witness and after hearing and considering his testimony in the light of his appearance have concluded that when he made his confession he told the truth and that he was not telling the truth at the trial. I cannot resist the conclusion that their judgment on a question of that kind is better than the judgment of a court possessing less favorable opportunities than the jury for reaching a correct conclusion on that question. And if the jury was right on that question that is conclusive. They evidently did not believe, as it seems to me most men will not believe, that the methods used leading up to the confession, even if occurring exactly as the defendant described them, would extort from an innocent man a confession of a crime which might be punishable with death. The defendant is on trial here and not the parties who procured his confession. A reversal of this judgment does not reach them. If as intimated in the prevailing opinion the officers of the law also became criminals, that does not mitigate the crime of the defendant. If two crimes are committed one is not punished by allowing the other to go unpunished. Believing that the verdict of the jury was intelligent and fair and that the conduct of the trial by the trial jusice was free from

error, I cannot assent to a reversal based upon a collateral impropriety entirely disconnected with the trial and not affecting the integrity of the verdict.

H. T. KELLOGG, J., concurred.

Judgment of conviction reversed and the defendant returned to the custody of the sheriff of Essex county, there to await trial or such further proceedings as may be proper.